UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 15-cv-61820-BLOOM/Valle

GHIASS MOUHAMED ALI,

    Petitioner,

v.

DISTRICT DIRECTOR, MIAMI DISTRICT,
U.S. CITIZENSHIP AND IMMIGRATION
SERVICES, *et al.*,

    Respondents.
_____/

## ORDER ON MOTION FOR SUMMARY JUDGMENT

**THIS CAUSE** is before the Court upon Respondents' (the "Government") Motion for Summary Judgment, ECF No. [37] (the "Motion"). The Court has carefully reviewed the Motion, the record, all supporting and opposing filings, the exhibits attached thereto, and is otherwise fully advised in the premises. For the reasons that follow, the Motion is denied.

**I.  BACKGROUND**

Petitioner Ghiass Mouhamed Ali ("Petitioner") is a citizen and national of Syria and lawful permanent resident ("LPR") of the United States pursuant to the grant of LPR status by the United States Citizenship and Immigration Services ("USCIS") on February 27, 2007. *See* ECF Nos. [37-1] ¶ 15 (Government's Statement of Undisputed Facts); [39-1] ¶ 15 (Petitioner's Statement of Undisputed Facts) (collectively, "Undisputed Facts"). He first entered the United States on a student visa in 1979, and began working at the Embassy of the Syrian Arab Republic ("Syrian Embassy") as an Arabic secretary on April 1, 1981. *See id.* ¶¶ 1-2. Petitioner held an

A-2 Visa while employed as a secretary, a position he held until November 6, 1984. *See id.* ¶¶ 3, 5. On November 16, 1984, Petitioner departed the United States for Syria. *See id.* ¶ 9.

Petitioner married his wife Hazar Ali in 1983, and on December __, 1984, Ms. Ali gave birth to Sablaa Ali ("Sablaa") in Fairfax County, Virginia. *See id.* ¶¶ 4, 10. The Government does not dispute Petitioner's claim that he returned to the United States from Syria in December of 1984, following Sablaa's birth. Petitioner claims that he became an Attaché with the Syrian Embassy only upon his return from Syria, on December 23, 1984. *See id.* ¶ 6. Records from the United States Department of State, however, reflect that the Syrian Government promoted Petitioner to the position of Attaché on November 6, 1984. *See id.* Petitioner enjoyed full diplomatic immunity throughout his tenure as Attaché, a position he held until November 25, 1986. *See id.* ¶¶ 7-8.

The record indicates that in 1985, Petitioner applied for a U.S. passport on Sablaa's behalf, which the Department of State denied based on a finding that Sablaa lacked United States citizenship. *See id.* ¶¶ 11-12; ECF No. [37-6]. Nearly 21 years later, Sablaa filed a Form I-130 (Petition for Alien Relative) on Petitioner's behalf, which the USCIS approved on May 29, 2006 after determining that Sablaa *is* a United States citizen. *See* Undisputed Facts ¶¶ 13-14; ECF No. [37-8]. Approved Form I-130 in hand, Petitioner applied for LPR status on August 9, 2006, which the USCIS approved on February 27, 2007. Undisputed Facts ¶ 15; ECF No. [37-9]. After waiting the requisite five years , Petitioner filed an N-400 (Application for Naturalization). Undisputed Facts ¶ 16; ECF No. [37-5]. This time, the USCIS denied Petitioner's application, finding that Sablaa had *not* obtained United States citizenship at birth due to Petitioner's position as Attaché at that time. *See* Undisputed Facts ¶¶ 16-17; ECF No. [37-10]. As such, the USCIS determined that Petitioner has never actually been lawfully admitted to the United States, LPR

card notwithstanding.  *See* Undisputed Facts ¶¶ 16-17.  Petitioner appealed the N-400 denial within the USCIS, and on July 10, 2015, the agency issued its final decision denying Petitioner's application to naturalize.  *See id.* ¶ 18; ECF No. [37-11].  On August 30, 2015, Petitioner filed a petition for review of the USCIS's decision with this Court, and the Government now moves for summary judgment.  *See* ECF Nos. [1], [37].  Petitioner's Response, and the Government's Reply, timely followed.  *See* ECF Nos. [39], [41].

## II.   LEGAL STANDARD

A court may grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The parties may support their positions by citation to the record, including, *inter alia*, depositions, documents, affidavits, or declarations.  *See* Fed. R. Civ. P. 56(c).  An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party."  *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).  A fact is material if it "might affect the outcome of the suit under the governing law."  *Id.* (quoting *Anderson*, 477 U.S. at 247-48).  The Court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in the party's favor.  *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006).  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which a jury could reasonably find for the [non-moving party]."  *Anderson*, 477 U.S. at 252.  The Court does not weigh conflicting evidence.  *See Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1140 (11th Cir. 2007) (quoting *Carlin Comm'n, Inc. v. S. Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986)).

The moving party shoulders the initial burden to demonstrate the absence of a genuine issue of material fact. *See Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). If a movant satisfies this burden, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Ray v. Equifax Info. Servs., L.L.C.*, 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Instead, "the non-moving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). The non-moving party must produce evidence, going beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designating specific facts to suggest that a reasonable jury could find in the non-moving party's favor. *Shiver*, 549 F.3d at 1343. But even where an opposing party neglects to submit any alleged material facts in controversy, the court cannot grant summary judgment unless it is satisfied that all of the evidence on the record supports the uncontroverted material facts that the movant has proposed. *See Reese v. Herbert*, 527 F.3d 1253, 1268-69, 1272 (11th Cir. 2008); *United States v. One Piece of Real Prop. Located at 5800 S.W. 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1103 n.6 (11th Cir. 2004).

**III.   DISCUSSION**

The Court reviews *de novo* the USCIS's denial of Petitioner's N-400. *See* 8 U.S.C. § 1421(c). In order to succeed on his petition, Petitioner must establish "strict compliance with all the congressionally imposed prerequisites to the acquisition of citizenship." *Fedorenko v. United States*, 449 U.S. 490, 506 (1981); *see Berenyi v. Dist. Dir., Immigration & Naturalization Serv.*, 385 U.S. 630, 637 (1967) ("the burden is on the alien applicant to show his eligibility for citizenship in every respect"). On summary judgment, however, the Government shoulders the

burden to establish the absence of a genuine issue of material fact.  *See Shiver*, 549 F.3d at 1343.  As explained below, whether Petitioner enjoyed diplomatic immunity at the time of Sablaa's birth – the central issue in this case – remains in dispute.  Thus, the Government has failed to meet its burden.

Relevant for purposes of the instant Motion, an applicant for naturalization must have resided within the United States continuously for at least five years "after being lawfully admitted for permanent residence."  8 U.S.C. § 1427(a).  Accordingly, an individual is eligible to apply for naturalization if he has been an LPR for five years.  In order to become an LPR, an individual must submit and have approved a Form I-485 by the USCIS.  The USCIS will only approve a Form I-485 if the applicant shows that he is (1) eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (2) an immigrant visa is immediately available to him at the time his application is filed.  *See* 8 U.S.C. § 1255(a).  United States immigrant visas are not "immediately available" to the vast number of individuals who wish to adjust status or enter the United States.  They are, however, immediately available to parents of United States citizen ("USC") children, once that child turns 21 years old.  *See* 8 U.S.C. § 1151(b)(2)(A)(i).  In order to establish that an immigrant visa is immediately available to a parent of a USC child pursuant to § 1151(b)(2)(A)(i), the USC child must file a Form I-130 on the parent's behalf, which the USCIS must then approve.

Petitioner complied with all of the above-outlined procedural steps.  Sablaa filed a Form I-130 petition on Petitioner's behalf in February of 2006, which the USCIS reviewed and approved, determining that Petitioner is the father of a USC (Sablaa) over the age of 21 years old.  *See* Undisputed Facts ¶¶ 13-14.  Petitioner then filed a Form I-485, which the USCIS reviewed and approved on February 27, 2007.  *Id.* ¶ 14.  By approving Petitioner's Form I-485

and allowing him to adjust his status to that of an LPR, the USCIS necessarily determined that (1) Petitioner is admissible to the United States for permanent residence and (2) an immigrant visa was immediately available to him through his USC daughter, Sablaa. Six years later, however, the USCIS concluded differently, denying Petitioner's application to naturalize based on its finding that Sablaa is not actually a USC, and that Petitioner was never properly lawfully admitted to the United States.[1]  *See* ECF No. [37-10].

Although a child born in the United States normally secures citizenship at birth, "[t]he United States Supreme Court has long held that the jurisdiction clause of the Fourteenth Amendment was intended to exclude from its operation children of foreign ministers or diplomatic officers born within the United States." *Raya v. Clinton*, 703 F. Supp. 2d 569, 576 (W.D. Va. 2010) (citing *Slaughter–House Cases*, 83 U.S. 36, 73 (1873) and *United States v. Wong Kim Ark*, 169 U.S. 649, 693 (1898)). Whether Sablaa obtained United States citizenship at birth, therefore, depends on Petitioner's diplomatic status at the time of her birth. The answer to that question, in turn, determines whether Petitioner has been lawfully admitted to the United States for permanent residence such that he is eligible to naturalize.

Despite her birth in Fairfax, Virginia, the parties agree that Sablaa did not become a USC at birth if Petitioner enjoyed full diplomatic immunity at that time. *See Nikoi v. Attorney Gen.*, 939 F.2d 1065, 1066 (D.C. Cir. 1991) ("Because one parent was a foreign official with diplomatic immunity when each child was born, the birth did not confer United States citizenship."). The parties also agree that if Petitioner served as an Attaché with the Syrian

---

[1] Despite the Government's position that Petitioner improperly secured LPR status without actually being lawfully admitted to the United States, it appears that the Department of Homeland Security has not initiated proceedings in immigration court to revoke Petitioner's LPR card.

Embassy at the time of Sablaa's birth, he enjoyed full diplomatic immunity.[2]  *See* ECF No. [39] at 7.  The Government argues that its records show that Petitioner became an Attaché on the same day he stopped working as an Arabic secretary: November 6, 1984.  Petitioner disagrees emphatically, stating that he did not actually become an Attaché until December 23, 1984, after Sablaa's birth.[3]  Petitioner's Undisputed Facts ¶ 6.  All primary evidence pertinent to this 30-year-old, fact-intensive dispute is either destroyed, housed with the United States Government, or located somewhere in war-torn Syria.

"The determination of whether a person has diplomatic immunity is a mixed question of fact and law."  *United States v. Al-Hamdi*, 356 F.3d 564, 569 (4th Cir. 2004).  Pursuant to the Diplomatic Relations Act of 1978, 22 U.S.C. §§ 254a–254e, the governing law in the United States on the issue of diplomatic privileges and immunities is the Vienna Convention on Diplomatic Relations ("Vienna Convention").  *See Tabion v. Mufti*, 73 F.3d 535, 538 (4th Cir. 1996). The Vienna Convention provides diplomatic agents a broad array of privileges and immunities, most notably "absolute immunity from criminal prosecution and protection from most civil and administrative actions brought in the 'receiving State,' *i.e.*, the state where they are stationed." *Id.* at 537.  "The Vienna Convention 'premise[s] diplomatic immunity upon recognition by the receiving state.'"  *Raya*, 703 F. Supp. 2d at 576 (quoting *United States v. Lumumba*, 741 F.2d 12, 15 (2d Cir. 1984)).  Under Article 10 of the Vienna Convention, the first step in obtaining diplomatic immunity begins with the sending state "notify[ing] the receiving state of 'the appointment of members of the mission, their arrival and their final departure or the termination of their functions with the mission.'"  *Id.* (quoting Vienna Convention, art. 10).

---

[2] The Government does not argue that Petitioner's prior status as an Arabic secretary conferred upon him diplomatic immunity such that it may affect Sablaa's citizenship.  *See* Motion at 11, 13.

[3] The Government does not challenge Petitioner's claim that Sablaa was born prior to December 23, 1984.

7

Pursuant to Article 43 of the Vienna Convention, the function of a diplomatic agent comes to an end:

> (a) on notification by the sending State to the receiving State that the function of the diplomatic agent has come to an end; [or]
>
> (b) on notification by the receiving State to the sending State that, in accordance with paragraph 2 of Article 9, it refuses to recognize the diplomatic agent as a member of the mission.

Vienna Convention, art. 43.  "Once the functions of a person enjoying privileges and immunities have come to an end, such privileges and immunities normally cease 'at the moment when he leaves the country, or on expiry of a reasonable period in which to do so.'"  *Raya*, 703 F. Supp. 2d at 577 (quoting Vienna Convention, art. 39).

As the Government has the burden on summary judgment, the Court begins with the evidence the Government has produced in support of its position that Petitioner had diplomatic immunity at the time of Sablaa's birth.  First, the Government cites to the signed statement of Clifton C. Seagroves, Acting Deputy Director of the State Department's Office of Foreign Missions, who states that Official Department of State records "indicate" that Petitioner assumed his duties as Attaché "effective November 6, 1984."  ECF No. [37-12]. In coming to this conclusion, Deputy Director Seagroves relies solely on information contained in the "TOMIS" database.  *See* Motion at 12; ECF Nos. [37-13] and [39-5] at 146:4-11 ("Seagroves Depo.").  The State Department uses the TOMIS database system to catalog the full accreditation record of individuals present in the United States on behalf of a foreign mission, and the Office of Foreign Missions reviews this database when it makes an immunity certification.  *See* Seagroves Depo. at 146:4-22, 147:1.  TOMIS reflects that Petitioner "assumed duty" as an Attaché on November 6, 1984 – the same date that TOMIS reflects Petitioner ended his job as secretary.  *See* ECF No.

[37-4] at 3, 4.  This information appears to have been entered into the TOMIS system on November 16, 1984, the date Petitioner left the United States for Syria.  *See id.* at 3

The Government states that in 1984, the TOMIS system was updated manually with information gleaned "exclusively through paper documents" issued by foreign embassies.  ECF No. [41] at 4.  The Government concedes that the only relevant, contemporary "paper document[]" in the record is a November 6, 1984 "Notification of Termination of Employment with a Foreign Government" ("Notification of Termination") issued by the Syrian Arab Republic, notifying the State Department that Petitioner's employment as secretary had terminated.[4]  *See* ECF No. [37-3] at 4; *see also* Motion at 13 ("According to the TOMIS database, and the available underlying records . . . ."); ECF No. [41] at 5.  This document is type-written, but in the margin, it contains an undated, hand-written notation in the English language, stating that Petitioner had been "promoted to attache."  ECF No. [37-3] at 4.  This handwritten notation is the only primary evidence in the record that supports the Government's position that Petitioner became an Attaché on November 6, 1984.

The Government has also submitted Sablaa's 1985 passport application, denied by the State Department with the handwritten note: "on Blue List 11/84 per protocol."  *See* ECF No. [37-6].  Whomever made the handwritten note appears to have replaced the number "11" (November) with the number "12" (December) for the date Petitioner allegedly appeared "on Blue List."  *See id.*  The referenced Blue List is a diplomatic list maintained by the Department of State.  The Government argues that the Blue List is not "conclusive evidence that a person listed enjoys diplomatic status."  Motion at 14 (citing *Trost v. Tompkins*, 44 A. 2d 226, 228-30 (Mun. Ct. App. D.C. 1945) and *United States v. Dizdar*, 581 F.2d 1031, 1034-35 (2d Cir. 1978)).

---

[4] The record production made by Agency Records Officer William P. Fischer includes only Petitioner's 1981 Notification of Foreign Government-Related Employment Status, and Petitioner's 1984 Notification of Termination.  *See* ECF No. [37-3].

9

Despite the State Department's stated rationale for denying Sablaa's passport application 31 years ago, the Government concedes that Petitioner did not actually appear on the Blue List until February 1985, *after* Sablaa's birth. *See* ECF No. [41] at 6; *see also* ECF No. [37-14]. As such, the Department of State's denial of Sablaa's passport application in 1985 constitutes circumstantial evidence of Petitioner's status at that time, evidence possibly premised on incorrect information.

The *only* primary and contemporary evidence produced by the Government in support of the information contained in the TOMIS database is the unidentified, hand-written note on the Notification of Termination. Petitioner disputes the accuracy of this notation, testifying that his position as secretary ended on November 6, 1984 (undisputed), and that he left for Syria on November 16, 1984 (also undisputed) for the purpose of applying for, training, and taking an exam to *become* an Attaché. *See* ECF Nos. [37-2] and [39-2] at 18, 19, 26-31, 78-79 ("Ali Depo."); *see id.* at 18:20-24 ("they told me I have to go . . . I have to go to Syria first and get it approved from there and go through a short course over there that they use for diplomats before they hire them"), 26:14-18 ("if you pass it, they will tell you -- they will give you a request -- they will hire. They will give a request to the Embassy to give you whatever status it is and send you back."), 27:20-21 ("it's not a definite thing when you go to that course."). Petitioner states that he first assumed and commenced his position as Attaché upon reentering the United States on December 23, 1984, after Sablaa's birth. *See id.* at 18, 19, 26-31. Petitioner did not receive an A-1 Diplomatic Visa until after Sablaa's birth, ECF No. [39-4], and the record does not contain any Notice of Foreign Government-Related Employment Status or Notice of Appointment documenting the date Petitioner became an Attaché. However, according to Deputy Director Seagroves and the Government, such documentation is required when an

10

individual is hired at a foreign embassy. *See generally* Seagroves Depo. at 13-16, 53-55; *see id.* at 14:14-17 (testifying that diplomats receive an A-1 visa before they enter the United States, and that *after* "they arrive, they go to their embassy or consulate, . . . and the embassy or consulate then submits what we refer to as a Notification of Appointment."); [41] at 5 ("Although this notation corroborates Ali's promotion . . . the Syrian Arab Republic had to have provided the Department of State with formal notification of his promotion"); *see also Raya*, 703 F. Supp. 2d at 578 ("The Notice of Appointment formally notified the State Department . . . the Vienna Convention requires sending countries to provide formal notice of a diplomatic agent's appointment and termination"). Deputy Director Seagroves further testified that when an embassy employee is promoted to a position that enjoys diplomatic status while in the United States, a "Notification of Change" document is issued to reflect the promotion and new status. *See* Seagroves Depo at 55:1-15. Neither party has provided the Court with a Notice of Appointment or Notice of Change document.[5]

Petitioner has also produced a "letter" that he wrote and sent to the "Ministry of Foreign Affairs – Syrian Arab Republic." ECF No. [37-16]. The letter is stamped and was returned to Petitioner by an individual apparently affiliated with the Syrian Government: "Raghdan Khalil," "Director of the Consular Department." *Id.* In his letter Petitioner asks that the Ministry "check the official records kept . . . to verify and attest to the work carried out by me during the 1980s in the Syrian Embassy in the United States of America." *Id.* Petitioner declares in his letter that he "did not work in any diplomatic position" at the Syrian Embassy until December 23, 1984, the date he "started [his] position as [A]ttaché." *Id.* Petitioner requests that the Ministry "check the official records kept by the Ministry of Foreign Affairs and . . . attest that the information

---

[5] Regardless of whether or not such documents have been destroyed by the Government pursuant to standard protocol, the Government still has the evidentiary burden on summary judgment.

concerning my work at the Syrian Embassy in the USA as outlined above is completely true and accurate." *Id.* The bottom of the letter, returned to Petitioner, contains two stamps in the Arabic language. One stamp states "Syrian Arabic Republic – Ministry of Foreign Affairs and Expatriates." Next to that stamp, in Arabic handwriting, is written: "[w]e attest to the validity of the information stated and represented in this application as submitted by Mr. Ali Ghiass." *Id.* Another stamp states, in pre-typed Arabic: "we attest to the authenticity of the signature without any responsibility as to the contents of this document." *Id.* That stamp is also from the "Syrian Arabic Republic – Ministry of Foreign Affairs and Expatriates." *Id.*

The Government argues that the stamps on the letter are inadmissible hearsay, and should not be considered on summary judgment. *See* Motion at 16. Under Rule 56(c)(4) of the Federal Rules, "[a]n affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." "'The general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment' . . . Nevertheless, 'a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form.'" *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293-94 (11th Cir. 2012) (quoting *Macuba v. Deboer*, 193 F.3d 1316, 1322-23 (11th Cir. 1999)); *see Longcrier v. HL–A Co., Inc.*, 595 F. Supp. 2d 1218, 1223 (S.D. Ala. 2008) ("The general rule in this Circuit is that parties' exhibits may be considered for purposes of pretrial rulings so long as they can be reduced to admissible form at trial[ ]"). "The most obvious way that hearsay testimony can be reduced to admissible form is to have the hearsay declarant testify directly to the matter at trial." *Jones*, 683 F.3d. at 1294 (citing *See Pritchard v. S. Co. Servs.*, 92 F.3d 1130, 1135 (11th Cir.

12

1996)). For purposes of the instant Motion, the Court finds that the letter and stamps meet this standard. Petitioner can testify at the hearing. "Raghdan Khalil," the "Director of the Consular Department," could also conceivably testify at Petitioner's hearing as to the accuracy of his declaration, and the contents of Petitioner's letter. The stamp from the "Syrian Arabic Republic – Ministry of Foreign Affairs and Expatriates" attests to the authenticity of "the signature" – presumably Mr. Khalil's. *See Davis*, 451 F.3d at 763 (Court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in the party's favor). Handwriting next to the other stamp "attest[s] to the validity of the information stated" in Petitioner's letter. ECF No. [37-16]. As "Director of the Consular Department," Mr. Khalil would presumably be competent to testify on the matters stated, and any records he used as the basis for his conclusion are potentially admissible at Petitioner's hearing. *See* Fed. R. Civ. P. 56(c)(4); Fed. R. Evid. 902(3), (11)-(12). The Court does not find that Petitioner has met his burden to establish that the letter *is* admissible at his hearing; rather, the Court holds that the letter may be considered on summary judgment. *See Jones*, 683 F.3d 1293-94. Having considered the letter, the Court concludes that it supports Petitioner's claim that the Syrian government did not promote him to Attaché, and that he did not occupy any diplomatic post, until he returned from Syria on December 23, 1984.

The Government argues that Mr. Khalil's letter, Petitioner's testimony, the timing of his A-1 Visa grant, and his non-existence on the Blue List do not conclusively establish that he did *not* enjoy diplomatic immunity at the time of Sablaa's birth. *See* Motion at 14; ECF No. [41] at 6-8. While this may be true, Petitioner is not tasked with the burden of proving a negative until his hearing before this Court. On the Government's Motion for Summary Judgment, the Government has the burden to show that the trier of fact could not reasonably find for Petitioner

13

based on the above-described evidence.  *See Miccosukee Tribe of Indians of Fla.*, 516 F.3d at 1243; *Anderson*, 477 U.S. at 247-48.  This, the Government has not done.  The Government has not produced formal evidence that serves as the basis for the TOMIS system determination.  Petitioner has presented his own testimony, a document purportedly from the Syrian government, and circumstantial evidence in support of his position, and the Government's arguments regarding the sufficiency of this evidence must wait until Petitioner's hearing; on summary judgment, the Court cannot weigh evidence, determine Petitioner's credibility, or draw many of the inferences that the Government urges the Court to draw.  *See Skop*, 485 F.3d at 1140; *Davis*, 451 F.3d at 763; *see also Reid v. Sec'y, FL Dept of Corr.*, 486 F. App'x 848, 852 (11th Cir. 2012) ("for purposes of summary judgment, there is nothing inherently wrong with 'self-serving testimony,' and it may not be disregarded by the district court in determining whether there is a genuine dispute of fact on a material issue in the case.").

Despite this material evidentiary dispute, the Government urges that the Court find the TOMIS system dispositive.  In support, the Government cites to the Eleventh Circuit's holding in *Abdulaziz v. Metro. Dade Cty.* that "once the United States Department of State has regularly certified a visitor to this country as having diplomatic status, the courts are bound to accept that determination, and that the diplomatic immunity flowing from that status serves as a defense to suits."  741 F.2d 1328, 1329-30 (11th Cir. 1984).  However, unlike *Abdulaziz* and the other diplomatic immunity cases in the criminal, tort, and family-law context cited by the Government,[6] the instant Motion does not concern Petitioner's current or future immunity suit.

---

[6] *See Carrera v. Carrera*, 174 F.2d 496, 497 (D.C. Cir. 1949) (finding in the context of suit for child support and custody that "[t]he courts are disposed to accept as conclusive of the fact of the diplomatic status *of an individual claiming an exemption*") (emphasis added)); *Al-Hamdi*, 356 F.3d at 573 ("the State Department's issuance of an A-1 visa to Al-Hamdi did not confer diplomatic status, and he was subject to the criminal jurisdiction of the United States at the time of his arrest."); *see also In re Baiz*, 135 U.S. 403 (1890) (asserting immunity from tort); *United States v. Khobragade*, 15 F. Supp. 3d 383 (S.D.N.Y. 2014)

Rather, the Court must determine whether the Government has met its burden to establish that the State Department properly afforded Petitioner diplomatic immunity nearly 32 years ago. Importantly, the conclusion reached in *Abdulaziz* is premised on the Eleventh Circuit's acknowledgement that "diplomatic immunity serves the needs of the foreign sovereign," and that the "purposes of such immunity are to 'contribute to the development of friendly relations among nations' and 'to ensure the efficient performance of the functions of the diplomatic missions.'" *Abdulaziz*, 741 F.2d at 1330 (quoting *Hellenic Lines, Ltd. v. Moore*, 345 F.2d 978, 980 (D.C. Cir. 1965) and citing *United States v. Arlington*, 669 F.2d 925, 930 (4th Cir.1982), *cert. denied*, 459 U.S. 801 (1982)). Such sovereignty concerns – naturally present when the United States seeks to hold a foreign national criminally or civilly liable – are hardly present in the instant dispute.

The most analogous case cited by the Government is *Raya v. Clinton*, a passport case, in which the district court noted that a "court may not review the State Department's factual determination as to whether an individual was entitled to diplomatic privileges and immunities on a particular date." 703 F. Supp. 2d at 577. *Raya*, however, is not binding on this Court, and unlike the instant case, the record in *Raya* contained an uncontested Notification of Appointment of Foreign Diplomatic Officer and a Notice of Final Departure of Foreign Diplomatic Officer, documenting the exact dates the petitioner's father had diplomatic immunity. *See id.* at 578. In this case, of course, the record does not contain any Notification of Appointment or other formal notification of Petitioner's appointment to Attaché. In any event, the *Raya* decision, like the other cases cited by the Government, stands for the narrower proposition that the State Department's "certification . . . that an individual [is] a diplomatic agent is binding on the court

---

(asserting immunity from criminal prosecution); *Montuya v. Chedid*, 779 F. Supp. 2d 60 (D.D.C. 2011) (asserting immunity from claims that the defendants failed to pay minimum wage); *United States v. Kuznetsov*, 442 F. Supp. 2d 102 (S.D.N.Y. 2006) (asserting immunity for prosecution for conspiracy to commit money laundering).

15

*when it is based on a reasonable interpretation of the Vienna Convention.*"  *Id.*  at 577.  Only after making such a determination does *Raya* counsel that a court may not go "behind the State Department's determination that the plaintiff's father enjoyed diplomatic privileges and immunities."  *Id.* at 578; *see also Al-Hamdi*, 356 F.3d at 573 ("we hold that the State Department's certification, which *is based upon a reasonable interpretation of the Vienna Convention*, is conclusive evidence as to the diplomatic status of an individual." (emphasis added)).  The Government concedes that "under the Vienna Convention," the handwritten notation on the Notification of Termination "could not be the basis for extending full diplomatic immunity to" Petitioner.  ECF No. [41] at 5.  As no other notification exists in the record, the Court finds that the Government has not established that the State Department's reading of the Vienna Convention was necessarily reasonable.  *See Vulcan Iron Works, Inc. v. Polish Am. Mach. Corp.*, 479 F. Supp. 1060, 1067 (S.D.N.Y. 1979) (holding that the State Department lacks the "unbridled discretion to deem notification sufficient or insufficient in individual cases" if such notice otherwise appears inadequate under the Vienna Convention).

The Government urges the Court to ignore the record's evidentiary omissions, and infer that the Department of State must have received "formal notification of [Petitioner's] promotion before the Department of State would extend full diplomatic immunity," as "agency actions are entitled to a presumption of regularity."  ECF No. [41] at 5.  On summary judgment however, all reasonable inferences are made in favor of the non-moving party.  Moreover, the presumption of regularity only exists "[a]bsent evidence to the contrary," *Sierra Club v. U.S. Army Corps of Engineers*, 295 F.3d 1209, 1223 (11th Cir. 2002).  As outlined above, contrary evidence exists in this case.  The Government cannot avoid its evidentiary burden on summary judgment by asserting a burden-shifting presumption, the factual basis of which Petitioner contests.  Lacking

16

the very evidence the Government concedes the State Department needs to "reasonably interpret" the Vienna Convention, the Court finds the instant dispute distinguishable from *Raya* and the other cited authority.[7] *See Vulcan Iron Works, Inc.*, 479 F. Supp. at 1067 (finding that "the notice that the State Department received of Golab's status was not 'notification' within the meaning of Article 10 of the Vienna Convention."); *c.f. Al-Hamdi*, 356 F.3d at 571 (finding that the defendant had "failed to show how the State Department's interpretation violates the dictates of the Vienna Convention"). As a material issue of fact remains in dispute, the Motion is denied.

## IV.  CONCLUSION

The USCIS has now twice concluded that Sablaa is a USC by birth, and twice determined that she is not. Petitioner will now have an opportunity to establish which conclusion is correct. The Court finds that the Government has failed to meet its burden to establish that summary judgment is warranted. A material dispute exists regarding Sablaa's citizenship status at birth and, thus, Petitioner's lawful admission. It is therefore

**ORDERED AND ADJUDGED** that the Government's Motion for Summary Judgment, **ECF No. [37]**, is **DENIED.** The parties' Joint Motion to Remove This Matter From The Trial Calendar And Suspend All Deadlines In The Scheduling Order, **ECF No. [42]**, is **DENIED** as moot.

**DONE AND ORDERED** in Miami, Florida this 14th day of September, 2016.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

---

[7] Based on the deficiencies described above, the Court also does not find it "clear from the record that the certification from the State Department [is] . . . not arbitrary or capricious, and . . . supported by substantial evidence." *Raya*, 703 F. Supp. 2d at 578.

Copied to:

Counsel of Record